TATE, Judge.
This is a suit to recover the damages to the plaintiffs’ 1960 rice crop allegedly caused by the release of harmful waste materials from an oil well drilling site. The plaintiffs are Montet, a tenant cultivating a 76-acre rice field on shares, and his landlords, the owners of the field. The defendants are the drilling company (“Nicklos”), its liability insurer, and the corporation which had employed Nicklos to drill the well.
At the trial it was proved that the 1960 yield of rice in the plaintiffs’ field was only 9.1 barrels per acre, whereas the yield in other fields in the vicinity was at least from 15-20 barrels per acre. The District Court dismissed the plaintiffs’ suit, however, apparently holding (untranscribed oral reasons only were assigned) that the plaintiffs had not proved by a preponderance of the evidence that this undoubted crop loss was caused by Nicklos’ release of harmful substances from its drilling site.
The plaintiffs appeal from this dismissal of the suit. The principal issue before us is the factual question of whether the evidence proves that Nicklos’ employees released into Montet’s irrigation canal any substances which caused the damaging of his 1960 rice crop.
The plaintiffs’ able counsel makes out an extremely strong circumstantial case for the affirmative. This 76-acre field alone of the farms in the vicinity, including four other tracts farmed by Montet, suffered such a crop loss; although the ultimate source of the water used to flood all of these fields was the same, the Boston Canal. Further the employees of Nicklos did in fact pump the contents of their “reserve” or waste pit into the irrigation canal from which Montet drew his water, during the time that he was first flooding his rice field preparatory to planting. The water Nicklos then emptied into the canal was reddish colored; afterwards, Montet’s field was covered with a reddish residue. The rice planted in this field shortly after this flooding did not grow well and much of it sickened and died, resulting in the substantial loss of Montet’s rice crop. Much of the reddish-colored drilling mud used by Nick-los did in fact contain substances harmful to young rice.
Defendants contend, however, that this undoubted loss of the Montet rice crop was not due to any harmful substance in the water pumped from the drilling site reserve pit, relying upon chemical analyses of the contents before and after the pumping and upon the testimony of certain employees that no salt-impregnated drilling mud or other harmful chemical substance had been placed into or pumped from the reserve pit. Defendants also rely upon certain testimony which, it is urged, proves that the damage to the plaintiffs’ crop was caused by salt water intrusion up through the Boston Canal from the marshes on the Gulf of Mexico *807 to the south, as well as by the lack of rainfall and by Montet’s failure to flood his crop for two months after the planting.
For the initial flooding of his field Montet pumped his water from an irrigation canal about a mile in length, the source of the water for which was the Boston Canal to the southwest of the plaintiffs’ field. Montet drew his water from a point on the Boston Canal designated as “A” on a plat found in the record.
The contents of the defendants’ reserve pit were pumped into Montet’s irrigation canal approximately midway between Mon-tet’s pump (at the northern end of the irrigation canal) and point “A” on the Boston Canal, which was about a mile southwest of the pump. Anything harmful released into the irrigation canal by the defendants from their drilling site would thus have been drawn up by Montet’s pump along with the waters from Boston Canal, and then spread over Montet’s field.
Montet commenced flooding his land on May 17, 1960. Before doing so on that day, he chemically tested the water at the pump-site, and again on the following morning at the same place. On both of these occasions the water’s salt content (24 grains per gallon) was within safe limits. On May 19th or 20th he noticed a reddish coloring of the water which was being pumped from the Nicklos drilling site, but he was then assured by the tool pusher (supervisor) in charge that the water being pumped by Nicklos into Montet’s irrigation canal and thence onto his field was harmless to rice. Montet continued flooding his field until May 24th. He planted his rice by air on June 1st, draining the field the following day.
On June 8-9 he noticed his rice was growing poorly, so he again flushed his land with water from the Boston Canal; .but this time by another irrigation ditch, drawing the water from the Canal (at a point designated as “R” on the plat in the record) approximately a mile north of the source on the Canal (i. e., point A) for the water for his earlier flooding. He tested the Canal water (however, at a boat landing yet another mile north of point R, the source of this second flooding of June 8-9), and he again found it safe.
This second flooding did not improve the condition of the young rice seedlings. They continued to turn yellow and to die. At this point Montet noticed that his field was colored with a reddish residue suggestive of drilling mud. He reported it to the County Agent’s office, which called in an inspector from the Louisiana Stream Control Commission, an agency with the statutory responsibility for policing the pollution of waters by industrial and other wastes.
Montet’s field was inspected by this official on June 14th and again on June 17th, the inspector being accompanied by the local agriculture teacher on the former occasion and by the inspector’s supervisor on the latter. These disinterested officials tested some residue water still on Montet’s field and found that it tested at 72-73 grains per gallon and had an 8.6 pH value [1], indicating an excessive saltiness and alkalinity of the water to a degree harmful to germinating rice.
On June 24th the Stream Control inspectors took samples from Montet’s field and sent them to the laboratory at Louisiana State University for analysis. Chemical analysis of these samples showed that the top one inch was saturated with salt to an extent harmful to germinating and growing rice; although the pH value of the soil was normal. These governmental employees further observed visually the red *808 dish discoloration of Montet’s field, suggestive of drilling mud, as did Montet and various other farmers in the vicinity who testified. A white salt encrustation was also visually observable, at least in some areas of the field.
The preponderance of the expert evidence introduced by both sides indicates that a salt content in excess of 35 to 40 grains per gallon in the irrigating water would be harmful to young rice, as would an alkalinity evidenced by more than a 7.5 to 8.0 pH value. Thus the substances contained in the residue water on Montet’s field tested by the Stream Control inspectors on June 14th and 17th undoubtedly were sufficient to cause the damage sustained by Montet’s 1960 rice crop.
The question, of course, is whether the plaintiffs have proved that these harmful substances were released into Montet’s irrigation canal by the Nicklos drilling crew. Breaux v. Magnolia Petroleum Co., La. pp. 3 Cir., 131 So.2d 615. However, circumstantial proof by reasonably excluding other possible causes of the crop loss is sufficient. Tuten v. Shell Oil Co., La.App. 1 Cir., 26 So.2d 757.
The defendants’ primary defense is that they have proved that no harmful substances were contained in the water pumped by Nicklos from its reserve pit into Montet’s irrigation canal. For, as one of the tool pushers admitted, the Nicklos employees had pumped into the Montet canal “water and mud. Yes, we pumped colored water into that canal”; but he further stated, “according to the mud test that we had run there wasn’t anything [in the water in the reserve pit pumped into the canal] that would hurt his rice.” Tr. 212.
The basis for this defense is that a mud engineer had tested the water in the reserve •pit on May 14th, before it was released into the irrigation canal, and found that it had a safe salt content of less than 20 grains per gallon and a normal (6.7 to 7.0) pH test. After Montet’s complaint, another mud engineer tested the water in the reserve pit on May 24th and again found it well under 20 grains per gallon (although, strangely enough since the complaint was of drilling mud pollution, he made no pH. test at that time, Tr. 270) ; at this time the engineer also checked the water in Montet’s irrigation canal opposite the drilling site, which was about one-half mile northeast of the Boston Canal, and found that this water had a salt content of 51.4 grains per gallon (Tr. 265), or well above the limits safe for young rice.
The two tool pushers and the two mud engineers employed during this time at the Nicklos drilling site all testified positively that minimal quantities had flowed into the reserve pit either (a) of the salt-concentrated water from the formation at 13,000 feet below the earth reached on May 11th or (b) of the chemically treated drilling mud which weighted down and absorbed the salt water. Such of this salt-concentrate and mud-mixture as did flow into the reserve pit came, these witnesses said, mostly from the dripping's from the drill-pipe when it was pulled up from underneath the ground. By their estimates these drippings were insignificant by volume compared to the amount of water in the reserve pit.
The plaintiffs’ counsel points out, with considerable force, that Nicklos had pumped water from its reserve pit into the irrigation canal from May 15th through May 24th and that, if accepted as accurate, these tests only prove that on May 14th and on May 24th, ten days apart, the water did not contain excess salt, and that only on the former occasion it did not contain an excessive pH value. It is pointed out that between these dates deleterious substances could have been emptied into the reserve pit and thence pumped into the Montet irrigation canal, from which Montet was drawing water to irrigate his rice during the same period; and that, in fact, during some of this time the water was colored with drilling mud; the chemical qualities of which include caustic soda which produces a high pH test.
*809 Against this contention is the testimony of the two tool pushers and the two mud engineers that no significant amount of these wastes escaped into the reserve pit. But these supervisors and technical employees were presumably absent from the drilling site many hours out of each twenty-four, although their testimony does not indicate this; nor does their testimony indicate the source of their positive knowledge that no significant quantities of the salt water or chemically treated mud had been washed into the reserve pit, at least during their absence from the site — although possibly non-introduced records of the volume maintained in the mud system of the well were the source of such knowledge.
Ultimately, weighing the evidence and respecting the trial court’s apparent evaluation of the credibility of these company witnesses as truthful, we must say that the plaintiffs’ proof is highly suggestive, but inconclusive, that the loss of Montet’s rice was caused by the release of harmful substances from the defendants’ drilling-site.
The reddish residue on the plaintiffs’ field and the high pH factor found by the Stream Control inspectors strongly suggest that harmful quantities of drilling mud were released, despite the positive testimony by defendants’ witnesses that no significant amounts of drilling mud found their way. into the reserve pit. As the state inspector stated, the high pH of 8.6 found in the residue water showed “a tendency of drill mud”, Tr. 181, for “through experience of about five years I noticed whenever there is a high pH in the water we always have drilling mud there. Of course, it’s possible that there is other things could do that besides drilling mud, but every time there is drilling mud I notice the pH is high. In other words, if I go to Vermillion River and check and there would be a high pH, the first thing I would look for would be to’ see if there are drilling nearby”, Tr. 182.’
On the other hand, the plaintiff produced no positive proof that this reddish residue contained harmful substances in sufficient-quantity to. harm his rice, nor was the residue ever identified by test as drilling mud! (although also, h is interesting to note, the: defendants’ agricultural expert who in' spected Montet’s field in connection with this litigation did not test the substance to identify it either, although he observed the discoloration, it being pointed out to him by Montet and the latter’s attorney as drilling mud, Tr. 305-306). The high pH in the residue water was suggestive of drilling mud but, as the inspector’s testimony shows, could also have resulted from other causes, which may have been the case if we accept as essentially truthful and accurate the positive testimony of the four of the employees from the drilling-site who testified that no excess drilling-mud or salt water escaped.
As a further defense, the defendants also rely upon certain evidence which tends to show that the loss of the plaintiffs’ rice crop was due to excessive saltiness of the water in the Boston Canal. This evidence assumes importance chiefly due to the inconclusiveness of the evidence as to whether the wastes released by Nicklos into Montet’s irrigation canal were harmful.
The Stream Control inspectors had found the excessive salt and pH factor in water remaining on Montet’s field after the second flooding of June 8-9. Tr. 147, 316-317. For this second flooding, Montet drew his water directly from another source (point R) on the Boston Canal, a mile north of the place (point A) from which his irrigation canal had drawn the water for the first flooding of May 17-24.
Defendants first contend, then, that the testing of this residue from the second flooding conclusively shows that the loss, of Montet’s rice crop resulted from the excess salt and value in the Boston Canal water drawn from point R — that is, from water which the Nicklos reserve pit could'not possibly have contaminated. However, water from point R was used to flood and irrigate another 21.8 acre tract leased by Montet, *810 on which his proven yield was 374.2 barrels, a normal yield of 17 barrels per acre. Tr. 128, ISO. This circumstance tends to corroborate Montet’s testimony that the water tested by the State inspectors and found to contain harmful substances, although on the land after the second flooding, nevertheless contained a diluted residue of harmful substances from the first flooding.
The water in the Boston Canal was tested by the Stream Control inspectors on the occasions of their visits and found to be within safe limits of 20-24 grains of salt per gallon; the samples, however, were taken at the boat landing, which was a mile above point R and about two miles above point A (the latter being the source of the first flooding). It should be added, however, that all the other farmer witnesses from the vicinity who used water from the Boston Canal during the 1960 season testified that it was safe and plentiful and that they made normal rice crops with it. The local agriculture teacher, who ran the water testing laboratory at the local high school, testified that there had been no complaints of saltiness in the Boston Canal water used for flooding rice during the 1960 season.
But, against this strong circumstantial case tending to exclude the Boston Canal water as the source of the undoubted saltiness of the water drawn for Montet’s first flooding, there is certain other evidence tending to the contrary.
In the first place, the plaintiffs’ rice field is the southernmost farm being cultivated and it is next to the marshes, so that the tides from the Gulf at the South would convey salt water through the Boston Canal to the plaintiffs’ field first of the rice fields in the area, since point A on the canal (from which plaintiff drew his water for the May 12-24 flooding) is south of the source of the water for the irrigation of the other rice fields. On occasions, the daily high tide (if it pushed up as far as the lands in question) could vary the salt content of the water as much as 15-20 grains. Tr 173. Montet admitted, without elaboration, that in 1960 there had been more salt water backing up the Boston Canal than for a few years before. Tr. 149.
Although perhaps coincidental to the point of incredulity, the variable salt water tides could thus have provided the source of the water which damaged Montet’s rice crop when taken from the Boston Canal at a point A during May 17-24; but could not quite have reached point R, only a mile above point A, which would thus explain why a normal crop was produced with water from point R and places above, whereas water taken from point A caused damage to the germinating rice in the plaintiffs’ field.
The plaintiffs attempted to negate such a theory with the testimony of Eugene Noel, who drew much of the water for his rice cultivation in 1960 by a long canal from a place on the Boston Canal further south than A. Thus, it is contended, the salt tides should have affected Noel before they did Montet; . but Noel nevertheless averaged 20-25 barrels of rice per acre in his 1960 yield. The canal by which Noel drew his water was connected with the Boston Canal to the southeast, 2i/¿ to 3 miles from his farm; but it was also connected with the Intracostal Canal to the north, Noel stated that the water in his canal tested 20 grains per gallon when he flooded for planting in April and May, although “later on during the season when I stopped pumping it was 70 then” (Tr. 196).
While we might assume that Noel intended to state that the water did not become salty until long after May, he does not specifically say so, nor was the vagueness of his testimony regarding this important fact clarified by further questioning. Considering this vagueness and also Noel’s further admission that the source of his non-salty water might be the Intracostal Canal to the north as well as the Boston Canal to the south (Tr. 199), we are unable to hold that Noel’s testimony alone sufficiently proves that the salt water tides in the Boston Canal were not the source of the salt *811 iness of tiie water which Montet pumped from point A between May 17-24 for the first flooding of his fields preparatory to planting.
Further, Montet never tested the Roston Canal water at point A itself; his tests, which he made only on May 17th and May 18th, were at his pump-site about a mile north of point A on the Boston Canal. The water he tested at the start of his pumping was thus primarily that which had been standing in his long and fairly wide irrigation canal, rather than any new and possibly salty waters drawn in from the Boston Canal. On May 24, a mud engineer tested the water in Montet’s irrigation canal for Nicklos and found a salt content of 51.4 grains per gallon (Tr. 265), which would be harmful to growing rice. On July 16th an agricultural expert employed by the defendants tested the water in the Montet’s irrigation canal at the pump and found that it contained 91 grains per gallon. Tr. 313.
On plaintiffs’ behalf, no tests were made of the water in the irrigation canal after May 18th, or ever in the Boston Canal at point A. The testimony of the defendants’ witnesses stands uncontradicted that tests of the salt content of the water in the reserve pit before and after their own pumping showed it to be within normal limits. We must therefore state that the evidence in this regard suggests that the Boston Canal at point A as the source of the excessive saltiness of the water in Montet’s irrigation canal, and thus of the water used in the first flooding of his rice field from May 17th through May 24th.
Considering this and also the inconclusiveness of evidence that any harmful substance was released by Nicklos into Mon-tet’s irrigation canal, we cannot say that the trial court erred in holding that the plaintiffs had not preponderantly proved that the loss of their 1960 rice crop did indeed result from Nicklos’ pumping of the contents of its reserve pit into the source of the water used by Montet for flooding his rice.
But the plaintiffs also rely upon the defendants’ claimed violation of LSA-R.S. 38:216, subd. A. This statute prohibits the emptying of “any oil, salt water or other noxious or poisonous substances or gases which would render the water unfit for irrigation purposes” into “any natural stream or drain from which water is taken for irrigation purposes” between January 1st and September 30th. The statute further requires that the operators or owners of wells “shall provide reservoirs or tanks and shall keep such water out of such natural rivers and drains, during the closed season between January 1st and September 30th, inclusive, of each year, and shall provide a watchman, night and day, to prevent leaks, breaks, secret pipes, or violations of this law”.
Plaintiffs’ able counsel suggests that the evidence shows that the Nicklos employees, after the initial testing, continued to pump the wastes from their reserve pit into the irrigation canal without constant checking as to the contents thereof and that Nicklos did not maintain a watchman, as required by the statute, to prevent leaks or breaks permitting harmful substances to be pumped into Montet’s irrigation canal and thus to destroy the plaintiffs’ rice crop. Although perhaps, as counsel suggests, the burden of proof should shift under the circumstances so as to require Nicklos to prove that the colored water which it pumped into the irrigation canal was not the cause of the damage to the plaintiffs’ rice soon thereafter resulting, we are cited to no authority for such a contention.
In conclusion, since we cannot say that the plaintiffs have preponderantly proved that harmful substances were contained in the water released by Nicklos into the plaintiffs’ irrigation canal, considering the trial court’s apparent acceptance of the testimony of the drilling-site employees as accurate, we affirm at the plaintiffs’ cost the judgment dismissing their suit.
Affirmed.

. See definition, of “pH” in Webster’s New Collegiate Dictionary (1956 ed.), p. 630: “A symbol denoting the negative logarithm of the concentration of the hydrogen ion in gram atoms per liter, used in expressing both acidity and alkalinity. pH values run from 0 to 14, 7 indicating neutrality, numbers less than 7 increasing acidity, and numbers greater than 7 increasing alkalinity. * * * ”